# IN THE UNITED STATES DISTRICT COURT
# FOR THE EASTERN DISTRICT OF WISCONSIN

---

**CHRISTOPHER WILCOX,**

       **Plaintiff,**

   **v.**

**AETNA LIFE INSURANCE COMPANY,**

       **Defendant.**

**Case No. 18-cv-00463**
**Honorable Judge William C. Griesbach**

---

### DEFENDANT'S MEMORANDUM OF LAW IN RESPONSE TO
### PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT AND IN
### <u>SUPPORT OF DEFENDANT'S CROSS-MOTION FOR SUMMARY JUDGMENT</u>

Submitted by:

**CHITTENDEN, MURDAY & NOVOTNY LLC**
Elizabeth G. Doolin
303 W. Madison Street, Suite 1400
Chicago, IL 60606
(312) 281-3600
(312) 281-3678 FAX
edoolin@cmn-law.com
**Attorneys For Defendant**

# TABLE OF CONTENTS

Page

INDEX OF AUTHORITIES ................................................................................................ ii

DEFENDANT'S MEMORANDUM OF LAW
IN RESPONSE TO PLAINTIFF'S MOTION FOR SUMMARY
JUDGMENT AND IN SUPPORT OF DEFENDANT'S
CROSS-MOTION FOR SUMMARY JUDGMENT ................................................................. 1

I.      INTRODUCTION ........................................................................................... 1

II.     SUMMARY OF MATERIAL AND UNCONTROVERTED FACTS ................. 2

        A.      The Relevant Policy Provisions .................................................... 2

        B.      Plaintiff's Background, Work History and Initial Claim ............. 5

        C.      Plaintiff's Appeal .......................................................................... 7

                1.      Overview ............................................................................ 7

                2.      Plaintiff's Medical History Pertinent to
                        the "Any Reasonable Occupation" Decision .................. 8

                3.      Aetna's Review Pertinent to the "Any Reasonable
                        Occupation" Decision ...................................................... 10

III.    LEGAL ARGUMENT ................................................................................... 14

        A.      Summary Judgment Standard ..................................................... 14

        B.      Standard of Review ...................................................................... 14

        C.      Aetna's Decision Has Rational Support in the Record .............. 15

        D.      Aetna Provided Plaintiff with a Full and Fair Review .............. 19

        E.      Plaintiff's Additional Criticisms of Aetna's Decision and
                Process Don't Withstand Scrutiny ............................................. 22

        F.      Even If This Court Were to Overturn Aetna's Decision,
                the Proper Remedy Would be Remand ....................................... 24

        G.      Plaintiff is not Entitled to Interest or Fees .............................. 25

# INDEX OF AUTHORITIES

Page

C̲A̲S̲E̲S̲

*Aberg v. Charter Communications et al.*,
No. 15-CV-571, 2016 WL 4444808 at *7 (E.D. Wis. August 23, 2016) .................................... 25

*Celotex Corp. v. Catrett*, 477 U.S. 317 (1986) ............................................................. 14

*Black & Decker v. Nord*, 538 U.S. 822 (2003) .................................................................. 23

*Black v. Long Term Disability Ins.,* 582 F.3d 738 (7th Cir. 2009) ................................. 23

*Davis v. Unum Life Ins. Co. of Am.*, 444 F.3d 569 (7th Cir. 2009) ............................... 15

*Des Armo v. Kohler Co. Pension Plan*, No. 13-C-436,
2014 WL 3860049, at *5 (E.D. Wis. Aug. 6, 2014) ............................................... 15, 22

*Dunn v. Menard, Inc.*, 880 F.3d 899 (7th Cir. 2018) ................................................. 14

*Estate of Jones v. Children's Hosp. & Health Sys. Inc. Pension Plan*,
892 F.3d 919 (7th Cir. 2018) ................................................................. 14, 15

*Geiger v. Aetna Life Ins. Co.*, 845 F.3d 357 (7th Cir. 2017) ...................................... 15, 17, 20, 22

*Geiger v. Aetna Life Ins. Co.*,
No. 15-cv-3791, 2016 WL 5391206, at *3 (N.D. Ill. Sept. 27, 2016) ........................................ 26

*Kolbe & Kolbe Health and Welfare Plan v. Med. Coll. Of Wis., Inc.*,
657 F.3d 496 (7th Cir. 2011) ................................................................. 26

*Herman v. Cent. States, Se. & Sw. Areas Pension Fund*,
423 F.3d 684 (7th Cir. 2005) ................................................................. 15

*Mommaerts v. Hartford Life and Accident Ins. Co.*,
No. 05-C-0894, 2006 WL 1663754, at *4 (E.D. Wis. June 12, 2006) ........................................ 23

*Wallace v. Reliance Standard Ins. Co.*, 318 F.3d 723 (7th Cir. 2003) ........................................ 23

S̲T̲A̲T̲U̲T̲E̲S̲

29 CFR §2560.503-1(g)(3)(iv)(January's 2017 version)........................................................ 7, 20

ERISA, 29 U.S.C. § 1001, et seq. (West 2019) ......................................................... 1

**DEFENDANT'S MEMORANDUM OF LAW IN RESPONSE TO
PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT AND IN
SUPPORT OF DEFENDANT'S CROSS-MOTION FOR SUMMARY JUDGMENT**

Defendant Aetna Life Insurance Company ("Aetna"), by and through its attorneys, Elizabeth G. Doolin and Chittenden, Murday & Novotny LLC, states as follows for its Memorandum of Law in Response to Plaintiff's Motion for Summary Judgment and In Support of Defendant's Cross-Motion for Summary Judgment:

## I.      INTRODUCTION

The only issue before this Court is whether Aetna acted arbitrarily and capriciously when it determined that Plaintiff Chris Wilcox ("Plaintiff" or "Wilcox"), a college educated insurance salesman with extensive computer skills, who also owned and ran an online business, was able to work in "any reasonable occupation" as defined by Plaintiff's employer-sponsored Long-Term Disability ("LTD") Plan.  The parties agree that the Plan is governed by ERISA, 29 U.S.C. § 1001, et seq. (West 2019) and that the arbitrary and capricious standard of review applies to Aetna's decision.

The material and uncontroverted facts before this Court show that Aetna's decision was reasonable, rational, and well-supported.  Aetna reached its decision only after (1) allowing Wilcox every opportunity to support his claim for LTD benefits and offer additional evidence on appeal; (2) reviewing thousands of pages of medical records, employment information, and analyses of same; (3) obtaining an independent physician review of Plaintiff's medical history (which included a consultation with one of his treating physicians); (4) concluding, based on its review, that the medical records, while extensive, lacked evidence showing that Plaintiff was functionally impaired from working in a sedentary occupation; and (5) conducting an in-depth analysis of Plaintiff's work history, skills and the relevant labor market.

1

Ignoring the overwhelming evidence supporting Aetna's decision, Wilcox insists that his medical history shows he is disabled and argues Aetna did not provide him a "full and fair review" of his claim. But the Administrative Record ("AR") demonstrates that Aetna did provide Plaintiff with a full and fair review – so much so that it reversed itself on the question of whether Plaintiff was disabled from his own occupation – *a decision Plaintiff does not challenge*. Plaintiff can't in one breath accept the legitimacy of Aetna's review when it benefits him, and also condemn it as being procedurally inadequate when it does not. The record shows that Aetna's decision was reasonable and rationally related to the Plan terms and the facts before it. This Court should deny Plaintiff's Motion for Summary Judgment and instead grant summary judgment in favor of Aetna.

## II.   SUMMARY OF MATERIAL AND UNCONTROVERTED FACTS[1]

### A.   The Relevant Policy Provisions

The benefits Plaintiff seeks are offered under an ERISA-governed employee welfare plan (the "Plan"), insured by Aetna pursuant to Policy No. GP-621126 (the "Policy"), issued to Policyholder Wisconsin Manufacturers & Commerce, Inc. Plaintiff's former employer, McCormick, Klessig & Assoc., Ltd., was a participating employer under the Policy as well as the Plan Administrator. Plaintiff was a participant in the Plan. (PPF ¶6, DPF ¶1)[2] The Policy includes the Policy document, the Schedule of Benefits and the Booklet Certificate, along with any attachments and riders. (Hereinafter the "Plan" or the "Policy"). (DPF ¶2) Aetna administered claims under the Plan. The Policy grants Aetna full discretion and authority to construe Policy

---

[1] Aetna acknowledges that its Responses to Plaintiff's Proposed Findings of Fact contain objections and denials to some of the facts as stated by Plaintiff. This is because Plaintiff's PPF offered inaccurate or incomplete descriptions of the contents of the AR, were not supported by citations to the AR (or improperly relied on sources outside of the AR), or contained immaterial facts. The material facts, as set forth in the AR, are not in dispute. In other words, while the parties may differ on the interpretation of the AR, the contents of the AR and the facts contained therein are undisputed.
[2] Citations to Plaintiff's Proposed Findings of Fact and Defendant's Proposed Findings of Fact will be designated as "PPF" and "DPF" respectively.

terms and make benefit determinations, and expressly states that Aetna "shall be deemed to have properly exercised such authority unless We [Aetna] abuse our discretion by acting arbitrarily and capriciously." (DPF ¶3)

The Policy describes full-time employees as "Full-time Active Officers" and explains "Eligibility" as follows, "You are in an Eligible Class if you are a regular full-time employee of an Employer participating in this Plan." (DPF ¶4). For eligible employees who are entitled to LTD benefits, the Policy identifies the "Scheduled Monthly LTD Benefit" as "60% of your monthly predisability earnings." (DPF ¶5). The Policy further states that "[t]he monthly benefit is an amount based on your monthly predisability earnings." (DPF ¶6). The Policy goes on to define predisability earnings:

> **Predisability Earnings**
>
> This is the amount of salary or wages you were receiving from an employer participating in this Plan on the day before a period of disability started, calculated on a monthly basis.
>
> *        *        *        *        *
>
> If you are paid on an annual contract basis, your monthly salary is 1/12th of your annual contract salary.

(DPF ¶7). Emphasis in the original.

To be eligible for LTD benefits, a claimant must satisfy the Policy's Test of Disability requirements:

> **Test of Disability**
>
> From the date that you first become disabled and until the end of the Own Occupation Period, you will be deemed to be disabled on any day if:
>
> - you are not able to perform the **material duties** of your **own occupation** solely because of: disease or **injury**; and

- your work earnings are 80% or less of your **adjusted predisability earnings**.

After the Own Occupation Period, you will be deemed to be disabled on any day if you are not able to work at any **reasonable occupation** solely because of:
- disease; or
- injury.

If your **own occupation** requires a professional or occupational license or certification of any kind, you will not be deemed to be disabled solely because of the loss of that license or certification.

(DPF ¶8). Emphasis in original.

The Policy defines "reasonable occupation" as:

**Reasonable Occupation**

This is any gainful activity for which you are; or may reasonably become; fitted by: education; training; or experience; or can be expected to result in; an income of more than 80% of your **adjusted pre-disability earnings**.

(DPF ¶9). Emphasis in original. The Policy defines "adjusted predisability earnings" as:

**Adjusted Predisability Earnings**

This is your **predisability earnings** plus any increase made on each January 1, starting on the January 1 following 12 months of a period of disability. The increase on each such January 1 will be by the percentage increase in the **Consumer Price Index** rounded to the nearest tenth; but not by more than 10%.

(DPF ¶10). Emphasis in the original. Thus, while the determination of *whether a claimant meets the income threshold* of the "any **reasonable occupation**" Test of Disability uses a claimant's "adjusted predisability earnings," the *amount of a claimant's monthly LTD benefit* is calculated based on that claimant's "predisability earnings" which does not include a CPI increase. (DPF ¶11).

4

The Policy's "own occupation" period is limited to 24 months. (DPF ¶12). The Policy also has a 24-month limit for disability "primarily caused" by either:

> a Mental Health or Psychiatric condition, including physical manifestations of these conditions, but excluding those with demonstrable, structural brain damage,
>
> or
>
> Alcohol and/or Drug Abuse."

(DPF ¶13). The Policy also provides detailed claim procedures for Plan participants seeking LTD benefits. (DPF ¶14). These procedures advise claimants that they may appeal a claim denial and expressly state, "[y]ou may submit written comments, documents, records, and other information relating to your claim, whether or not the comments, documents, records, or information were submitted in connection with the initial claim." (DPF ¶14).

**B.      Plaintiff's Background, Work History and Initial Claim**

Plaintiff is college educated and accomplished. He completed 4 years of college and studied English, print journalism, public relations and marketing. (DPF ¶15). Staring in 2004, Plaintiff worked for McCormick, Klessig & Assoc., Ltd as an insurance salesman. (DPF ¶15). Prior to the start of his disability, he was licensed to sell property, casualty, life, and health insurance, as well as variable insurance products. (DPF ¶15). He also held Series 6, 62, 63, and 65 securities licenses. (DPF ¶15). In addition, he is proficient in keyboarding, web design, Microsoft certified, and proficient in Microsoft applications (Excel, Word, Outlook, PowerPoint). (DPF ¶15). From 2009 up to at least February 20, 2017 (the last date he submitted employment information to Aetna), Plaintiff was also the owner and president of CGW Holdings, Inc., a business which provided web design, hosting, networking system integration, and VOIP phone systems. (DPF ¶15).

5

Plaintiff's work as an insurance salesman required extensive driving, long hours, frequent lifting of up to 10 pounds and occasional lifting up to and including 50 pounds or more. (DPF ¶16). He also helped agents with their accounts and managed the office computer systems. (DPF ¶16). Accordingly, Plaintiff's job was categorized as a light physical demand (not sedentary) occupation. (DPF ¶16). On September 9, 2014, Plaintiff initiated a claim for LTD benefits under the Policy, based on cervical and lumbar degenerative disc disease and chronic pain, coupled with other co-morbid conditions. (DPF ¶17). Aetna advised him in writing on September 11, 2014 of what information it needed to evaluate his claim and followed up with him and his doctor to obtain that information, which included employment and wage information, medical information, and an Attending Physician's Statement ("APS") from his treating physicians. (DPF ¶18-19). Aetna interviewed Plaintiff by phone and requested and Aetna's medical consultant reviewed medical records from Plaintiff's health care providers. Aetna also reviewed an October, 2014 APS from Plaintiff's neurologist, Dr. Mark Szmanda, who identified "Spinal Degeneration" and "Post-Concussion Syndrome" as Plaintiff's medical conditions but declined to comment on Plaintiff's functionality, deferring to Plaintiff's pain specialist, Dr. Ellias. (DPF ¶20). Aetna requested an APS from Dr. Ellias, but that APS was returned incomplete. (DPF ¶19). Aetna proceeded with its review and denied Plaintiff's claim on March 24, 2015, concluding that the medical records did not support or substantiate any functional limitations on Plaintiff's ability to work in his own occupation. (DPF ¶23). Aetna also noted that many of the medical conditions reported by Plaintiff were not substantiated by clinical evidence. (DPF ¶23). For example, Aetna noted Plaintiff's EEG and MRI tests were normal, his spinal MRI showed only mild degenerative changes, and there were limited records supporting his claimed cervical limitations. (DPF ¶23). Aetna advised Plaintiff of his rights to appeal the decision. (DPF ¶23).

## C.    Plaintiff's Appeal

**1.    Overview:** Plaintiff appealed Aetna's decision on September 22, 2015.  (DPF ¶24).

Thereafter, Aetna afforded Plaintiff numerous extensions, agreeing several times to toll the appeal[3]

in order to allow him time to submit additional information and to obtain legal counsel.  (DPF ¶24,

25).   After Plaintiff hired a lawyer, Aetna again agreed to toll the appeal to give counsel every

opportunity to submit additional information for Aetna to consider.  (DPF ¶26).  Plaintiff and his

counsel submitted additional APSs from his treating physicians, including: an additional APS from

Dr. Szmanda dated April 23, 2015 (DPF ¶27), a letter and APS from Dr. Ellias dated December

30, 2015 (DPF ¶27); and an APS from Dr. Kneeland dated August 17, 2015 (DPF ¶27).  In his

APS, Dr. Kneeland listed Plaintiff's primary diagnosis as "chronic low back pain" with secondary

diagnosis of "fibromyalgia" and other diagnosis of "lumbar stenosis."  (DPF ¶27).  While Dr.

Kneeland listed Plaintiff as unable to work as of July 4, 2014 to an "unknown" date he also

indicated that Plaintiff was able to do "light work activity."  (DPF ¶27).  Plaintiff and his counsel

also submitted medical records from multiple medical providers, dating back to 2009. Plaintiff saw

these providers for medical treatment and pain management.  (DPF ¶28).

On March 31, 2017, after extensive review and analysis of the additional documents,

medical records, and information submitted on appeal, Aetna reversed its initial decision in part,

finding that Plaintiff was disabled under the "own occupation" Test of Disability for the period

from September 27, 2014 through September 26, 2016.  (DPF ¶62).  Aetna determined that

Plaintiff's job as an insurance salesman had a light (not sedentary) physical demand level that was

not compatible with the restrictions identified by the independent physician that reviewed

---

[3] Such tolling "stopped the clock" on the time limit ERISA imposes on claims administrators to decide an appeal within a set time period (45 days, with one 45 day extension allowed). 29 C.F.P. § 2560.503-1 (January 1, 2017 version).

Plaintiff's medical history. (DPF ¶62). Accordingly, Aetna paid Plaintiff benefits for the full "own occupation" period of disability. (DPF ¶62). Because Aetna also concluded that Plaintiff's functional restrictions did *not* prevent him from working in "any reasonable occupation" as defined by the Policy, Aetna upheld its denial under the "any reasonable occupation" Test of Disability. (DPF ¶63).

        **2.**       **Plaintiff's Medical History Pertinent to the "Any Reasonable Occupation"**

**Decision:** At issue in this case is Aetna's decision that Plaintiff was not disabled, as defined by the Policy, after September 26, 2016. While the medical records in the AR go back to 2009, the most pertinent are those from the spring and fall of 2016.[4] On April 11, 2016, Plaintiff began treating with Dr. Jadin-Cardelli, who observed that "[h]e has multiple somatic complaints and is frequently seeking additional medical care. Goal with him is to avoid unnecessary referrals and interventions which could lead to iatrogenic complications." (DPF ¶35). While Dr. Cardelli noted Plaintiff's various medical issues in her records, she did not document significant or consistent functional impairment as a result those conditions. (DPF ¶35-40). And, for many of Plaintiff's medical conditions, Dr. Cardelli ordered additional testing for which the results were normal. (DPF ¶35-40). For example, Plaintiff's liver MRI on August 24, 2016 showed unremarkable findings with the exception of several small benign cysts (DPF ¶36), Plaintiff's chest CT on September 7, 2016 showed no evidence of active interstitial lung disease (DPF ¶38), and an MRI of Plaintiff's cervical spine on September 28, 2016 showed only minimal degenerative disease. (DPF ¶40). Plaintiff's medical records document other conditions, such as left-hand carpel tunnel syndrome diagnosed

---

[4] Even the records from earlier dates, however, show that Plaintiff's medical history was one of "seeing numerous physicians for numerous somatic complaints" (DPF ¶29) and multiple instances of non-compliance with medical advice and pain management protocols, as well as one incident where Plaintiff demanded that dates in his medical records be changed. (DPF ¶30, 34, 41).

on September 13, 2016, but the records show no discussion or documentation of any significant functional impairment as a result of those conditions. (Aetna's Response to PPF ¶40).

Plaintiff's treating physicians, including Dr. Kneeland and Dr. Jadin-Cardelli did consistently note concerns about Plaintiff's opioid use and possible overmedication. (DPF ¶32, 33, 39). In addition, some of the medical conditions initially identified in the 2016 records as "syncopal episodes" or "suspected seizures" were later determined to most likely be the result of medication overuse. (DPF ¶39). For example, on September 12, 2016, Dr. Jadin-Cardelli saw Plaintiff, who reported an episode where his housemates saw him shaking or twitching before falling to the floor. Dr. Jadin-Cardelli noted that it was "difficult to know what caused the patient's episode" and that "Also think it very likely he could've lost consciousness due to overmedication." (DPF ¶39). Dr. Jadin-Cardelli referred Plaintiff for a head CT that same day, the result of which showed normal findings with "no acute intercranial abnormality." (DPF ¶39).

Similarly, Plaintiff's suspected seizure on October 31, 2016[5] was subsequently determined to more likely be the result of medication overuse or withdrawal. While hospitalized for that episode, Plaintiff's EEG was negative for seizure activity and no other clinical testing or findings confirmed any seizure disorder. (DPF ¶41). In fact, the hospital records document Plaintiff denying any history of seizures. (DPF ¶41). Plaintiff did suffer a head injury as a result of his apparent fall on October 31, 2016, with some sub cranial hemorrhaging shown in a CT scan on November 1, 2016, but a follow-up brain CT on December 1, 2016 showed that the earlier findings had cleared, with "no acute intercranial process." (DPF ¶42). No clinical findings related to the October 31, 2016 episode showed any consistent functional impairment. (DPF ¶41-42). To the contrary, Plaintiff passed a memory test before he was discharged. (DPF ¶42).

_____

[5] The "seizure" description in the record came from speculation by Plaintiff's housemate, who reported she found him unconscious on the floor of his room. (DPF ¶40).

**3.** **Aetna's Review Pertinent to the "Any Reasonable Occupation" Decision:** Upon receipt of Plaintiff's appeal submissions, Aetna sought an independent medical review, via a third-party vendor[6], by a physician who was a Diplomate of the American Board of Internal Medicine, a Diplomate of the American Board of Preventative Medicine, and Board Certified in Occupational Medicine. (DPF ¶43). That physician, Dr. Chalonda Hill, reviewed the medical records submitted with the appeal, along with the earlier submissions from plaintiff's initial claim. (DPF ¶43). In her report, Dr. Hill also explained that she reviewed all the records, and she directly commented on those most pertinent to the time frame at issue. (DPF ¶40). Dr. Hill also consulted directly with Plaintiff's pain specialist, Dr. Ellias, on January 31, 2017. Dr. Ellias opined to Dr. Hill that Plaintiff had "degenerative disc disease" and a "seizure disorder" as well as "decreased range of motion" which combined so that "he is unsure if [Plaintiff] is able to function in any job." (DPF ¶45).

In his APS and related written submission, which Dr. Hill reviewed, Dr. Ellias also opined that Plaintiff had a "personality dysfunction" that, combined with the effects of his pain medication, would make it impossible for him to return to work. Dr. Ellias based this opinion on the findings of psychiatrist Dr. Azizi, who completed a psychiatric evaluation of Plaintiff on March 6, 2014, prior to surgery to place a spinal cord stimulator for pain relief. (DPF ¶46). But Dr Azizi concluded that Plaintiff had "no psychiatric conditions present" that would preclude surgery. Dr Azizi's APS completed in 2015 restricted Plaintiff from driving but also found that Plaintiff, while showing some anxiety and low mood, had essentially normal psychological functioning. (DPF ¶47). The medical records also show that while Plaintiff took antidepressants and was treated by a psychiatric nurse practitioner and a licensed clinical social worker in 2015, that treatment ended

---

[6] Aetna did not hire a specific doctor but engaged a third-party vendor to ensure an independent physician. See (DPF ¶43).

in September of 2015, a year before the end of Plaintiff's "own occupation" period of disability. (DPF ¶47).

Based on her review of all the medical records, including those from 2016 discussed above, Dr. Hill concluded in a 22-page report dated February 1, 2017 that Plaintiff *did* have functional impairments due to his medical conditions (including cervical and lumbar degenerative disc disease, seizure disorder, bilateral knee degenerative joint disease, left avulsion distal fracture of distal tibia, failed back syndrome, and long term opioid use)[7] (DPF ¶48). Dr. Hill also opined that Plaintiff was capable of working full time with certain restrictions that took his functional impairments into account. Specifically, Dr. Hill found as follows:

> The claimant is capable of working full time with the following restrictions:
>
> Able to sit up to 1 hour at a time for a total of 8 hours per day. Allow for five minute breaks after sitting one hour for position change
>
> Able to walk up to 20 minutes at a time for a total of 2 hours per day
>
> Able to stand up to 30 minutes at a time for a total of 2 hours per day
>
> Occasionally – lifting/carrying up to 20lbs, pushing/pulling up to 25 pounds, bend twist, squat, reach (above shoulder, at desk level, below desk level), simple grip and firm grasp, climb one flight of stairs, use lower extremities for operation of foot controls
>
> Never – work at unprotected heights, work near open bodies of water, knell, crawl, climb ladders, drive, operate heavy machinery.

(DPF ¶49). Dr. Hill also acknowledged Plaintiff's other co-morbid conditions but opined they did not cause Plaintiff any functional impairment. (DPF ¶50). Dr. Hill also explicitly acknowledged

---

[7] Dr. Hill took the reports of seizure disorder into account, although the later medical records relied upon by Plaintiff show that there was no clinical support for that diagnosis. In other words, in her analysis Dr. Hill resolved doubts in Plaintiff's favor.

and discussed Plaintiff's impairments based on his pain medication, which she explained was the reason for her restrictions listed above.  (DPF ¶50).

In order to fully understand Dr. Hill's conclusions, Aetna sought clarification, asking, "Was the EE [employee] able to work full time with the restrictions and limitations you provided from the FDA 7/10/2014 to the present or was he totally limited for any job from 7/10/2014 to what period?" and "Under what period based on his treatment would the restrictions and limitations apply?"  (DPF ¶51).  The response pointed out the specific sections of Dr. Hill's report detailed above.  (DPF ¶51).  In addition, Dr. Hill provided an addendum to her report, dated March 22, 2017, which addressed more specific questions about the effects of Plaintiff's medications.  (DPF ¶52).  Dr. Hill confirmed that while Oxycontin, Oxycodone, and Keppra were included in his medications identified at an 11/9/16 office visit with a nurse practitioner (one of the latest medical records available), "there was a lack of clinical evidence to support cognitive impairment related to that medication."  (DPF ¶52).  Dr. Hill's conclusions were similar for questions about Plaintiff's judgment and reaction time, and Plaintiff's ability to perform the activities of daily living as a result of his medications.  (DPF ¶52).  In both reports, Dr. Hill certified that she had no relationship with claimant, his providers, or with "any services which may be associated with this claim" and further certified that she had no "incentive, financial or otherwise, that would lead me to offer an opinion other than based on my honest professional assessment of the information provided for review."  (DPF ¶53).

After reviewing Dr. Hill's first report, Aetna also sought a Transferrable Skills Analysis/Labor Market Analysis ("TSA/ LMA"), which resulted in a report dated March 3, 2017.  (DPF ¶54).  The report took into account both Dr. Hill's functional restrictions and Plaintiff's self-reported work history and experience.  Plaintiff's annual salary was $57,200.04.  Aetna calculated

the 80% threshold earnings test provided by the Plan to result in annual adjusted amount of $46,035, a weekly adjusted amount of $3,836.25, and an hourly adjusted amount of $22.13. (DPF ¶55).

Using a target hourly wage of $22.13 and considering a labor market within 100 miles of Plaintiff's earlier Deerbrook, WI address, the TSA/LMA reported that the relevant geographic region had "a workforce population of approximately 167,720, who earn a mean wage of $20.40 per hour across all occupations." (DPF ¶56). Plaintiff's address in Neenah WI is *closer* to the Green Bay area included in the labor market analysis than Deerbrook. (PPF ¶67, DPF ¶57). The TSA/LMA identified a list of Plaintiff's transferrable skills (including communication skills, customer service, and knowledge of sales abilities). (DPF ¶58). The TSA/LMA also considered Plaintiff's physical restrictions, noting the availability of "ergonomically correct workstations," "voice-activated software (which would include use of headset) and/or a one-handed keyboard" as well as the ability to take breaks and change positions. (DPF ¶58).

Based on all of these factors, the TSA/LMA identified "close," "good," and "fair" matches "within the skills, functional abilities and reasonable wage" considerations for Plaintiff. (DPF ¶59). The report specified that a "close match" identified the "same work activities/industries the worker has done in the past" while a "good" match involved "similar activities," and "fair" job matches "include similar work activities or jobs in similar industries that the worker has done in the past." (DPF ¶59-60). The TSA/LMA specified three matches out of the multiples it found, all of which had an hourly wage above $25/hour. These matches included "President /Owner" with an hourly wage of $53.94, "Supervisor, Order Takers" with an hourly wage of $25.21, and "Customer Service Supervisor" with an hourly wage of $25.21. (DPF ¶59). Accordingly,

considering all relevant information, the TSA/LMA concluded that there were reasonable potential jobs within Plaintiff's geographic region, skill set and functional abilities. (DPF ¶61).

Reviewing all of the information before it, including the Plan terms, the medical information, employer data, the documents Plaintiff submitted, the detailed analysis of Dr. Hill, and the TSA/LMA, Aetna determined that while Plaintiff was disabled from his own occupation, he was not disabled from "any reasonable occupation" as defined by the Policy. (DPF ¶63).

## III.     LEGAL ARGUMENT

### A.     Summary Judgment Standard

Summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). See also *Estate of Jones v. Children's Hosp. & Health Sys. Inc. Pension Plan*, 892 F.3d 919, 923 (7th Cir. 2018) citing *Dunn v. Menard, Inc.*, 880 F.3d 899, 905 (7th Cir. 2018). The "plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322.

### B.     Standard of Review

The parties agree that this case is governed by ERISA and that the Policy confers broad discretion on Aetna to both interpret the language of the Policy and to make benefit determinations. As a result, this Court will review Aetna's decision under the arbitrary and capricious standard. *Estate of Jones*, 892 F.3d at 923 (7th Cir. 2018). Under the arbitrary and capricious standard, as the Seventh Circuit recently explained, "the reviewing court must ensure only that a plan

14

administrator's decision has rational support in the record." *Id.* (quoting *Geiger v. Aetna Life Ins. Co.*, 845 F.3d 357, 362 (7th Cir. 2017)). Moreover, "[w]hile the deferential standard does not make the court 'a rubber stamp,' it does mean that the court 'cannot reverse course unless a decision is "downright unreasonable."'" *Des Armo v. Kohler Co. Pension Plan*, No. 13-C-436, 2014 WL 3860049, at *5 (E.D. Wis. Aug. 6, 2014) (quoting *Davis v. Unum Life Ins. Co. of Am.*, 444 F.3d 569, 576 (7th Cir. 2009)). Finally, "[w]hile an administrator's decision must have rational support, it 'need not explain the reasoning behind the reasons, ... that is, the interpretive process that generated the reason for the denial.'" *Estate of Jones*, 92 F.3d at 923. (quoting *Herman v. Cent. States, Se. & Sw. Areas Pension Fund*, 423 F.3d 684, 693 (7th Cir. 2005).

### C.    Aetna's Decision Has Rational Support in the Record

Aetna's decision is anchored in all respects by substantial evidence and support. The Policy language, which recognizes a change in the standard applicable to determine disability after 24 months, supports Aetna's conclusion that Plaintiff had to be disabled from working in "any reasonable occupation" in order to receive benefits beyond September 26, 2016. For this reason, evidence that Aetna relied on to support its decision that Plaintiff was disabled from performing the more strenuous duties of his own occupation is not dispositive of whether Plaintiff met the "any reasonable occupation" test in the fall of 2016. Similarly, medical evidence from 2014 and earlier (upon which Plaintiff leans heavily in his motion papers), is far less compelling than the medical evidence available from the spring and early fall of 2016. Much of the evidence from that more relevant time period shows that, while Plaintiff continued to visit his doctors for multiple medical conditions and pain management, his medical tests were for the most part normal and unremarkable. (DPF ¶¶35 – 38, 40).

In fact, while Plaintiff and his counsel submitted extensive medical records going back to 2009, notably absent from those records is *any* documented support for *functional restrictions* that would preclude Plaintiff from working in a sedentary occupation, particularly given his skills and experience. And while there is no dispute that Plaintiff has been diagnosed with a number of medical conditions, and no dispute that Plaintiff *discussed* many other suspected medical conditions with his physicians, there is little evidence of the type of functional impairment Plaintiff now claims establishes his continued disability. To the contrary, the medical records are replete with instances of Plaintiff discussing conditions with his physicians, with subsequent testing yielding normal results. (DPF ¶35 – 38, 40). One of Plaintiff's own treating physicians, Dr. Kneeland, noted in his APS that Plaintiff could perform "light work activity." (DPF ¶27). Moreover, some of the medical events Plaintiff experienced in the fall of 2016 were (1) neither "seizures" nor "syncopal episodes" as originally thought; and (2) of a relatively short duration, with no documented long-term functional impairment. (DPF ¶39 – 42). Indeed, while hospitalized in the late fall of 2016, Plaintiff performed with normal results on memory testing, and had a normal EEG. (DPF ¶41 – 42).

Moreover, while the records document that Plaintiff was managing his pain with opiates, they also document that his occasional medication issues stemmed from overuse and misuse. (DPF ¶34). The records document numerous instances of physicians recommending that Plaintiff taper down on his medications, or not take the combination of medications he was taking. (DPF ¶31 – 33). Both Dr. Kneeland and Dr. Jadin-Cardelli noted that Plaintiff's issues with sleepiness and falling were related to medication overuse, and the Theda Care hospital physicians who treated him in October and November of 2016 observed the same. (DPF ¶41). Improper medication use does not support functional impairment as a result of disease. More importantly, the records don't

16

document any *consistent* cognitive or functional impairment (beyond Dr. Hill's restrictions) as a result of Plaintiff's medication use, but at best show some episodes related to isolated instances of medication overuse.

For these reasons, Dr. Hill's 22-page analysis and subsequent addendum reasonably concluded that while Plaintiff had restrictions that would prevent him from working in a light duty occupation, there was no evidence that Plaintiff lacked the functional capacity for sedentary work. Notably, and directly contrary to what Plaintiff incorrectly states in his motion papers, Dr. Hill took Plaintiff's medication use into account, restricting Plaintiff from certain activities, including driving and operating heavy machinery. But based on the medical records as a whole, it was reasonable and rational for Dr. Hill to conclude that Plaintiff had the functional capacity for sedentary work, and it was reasonable and rational for Aetna to rely on her opinion.

Aetna's vocational assessment was also reasonable and rational. Plaintiff's own submissions documented his strong educational and vocational background, including a college education and an impressive computer and technology skill-set. Plaintiff also owned and ran his own business for years. (DPF ¶15). Given this data, it was more than reasonable for Aetna's Transferable Skills Analysis/Labor Market Analysis ("TSA/LMA") to identify positions described in the Dictionary of Occupational Titles such as "President/Owner," "Supervisor, Order Takers," or "Customer Service Supervisor" as reasonable options for Plaintiff. The Policy expressly defines "reasonable occupation" to include those for which claimant "may reasonably become fitted by education, training or experience." (DPF ¶9). So the TSA/LMA's identification of "fair" matches such as "Customer Service Supervisor" was reasonable based on Plaintiff's background, even if Plaintiff had not worked in exactly that job before. *Geiger v. Aetna*, 845 F.3d at 363 (holding,

based on the same language, that Aetna was reasonable in identifying occupations plaintiff had not performed, but "may reasonably become" fitted to perform).

Nor was it in any way inappropriate for the vocational analyst to consider a 100-mile radius from Plaintiff's earlier address (including the Green Bay, WI region), when evaluating the relevant labor market. *First*, there is no dispute that Plaintiff's address changed several times during the pendency of his claim, such that using his prior address cannot be described as arbitrary and capricious. *Second*, Plaintiff's address at the time was actually *closer* to the Green Bay area. Had the analyst used Plaintiff's Neenah, WI address, the labor market survey would have still included the Green Bay area, and would have been materially the same. In fact, the exemplar jobs identified in the TSA/LMA would have been closer to Plaintiff. *Lastly*, and most importantly, a transferrable skills analysis and labor market survey is not a guarantee of employment at a specific job or in a specific location. Instead, it provides information about what is potentially available in a reasonable geographic region. For this reason, Plaintiff's insistence that the analysis was flawed because it *required* him to drive doesn't wash. The analysis identified the potential for reasonable employment – it was not an exhaustive list of every job available, or the only jobs available in the region. Plaintiff's argument here also ignores the availability of public transportation, carpools, and ride-share applications. Nothing in the jobs identified in the TSA/LMA *required* Plaintiff to drive.

Nor was the TSA/LMA compromised by a minor error that misidentified the proper percentage rate for the income threshold required of the "any reasonable occupation" Test of Disability. While the TSA/LMA identified a "60% of adjusted predisability earnings" rate than the "80% of adjusted predisability earnings" rate of the Plan, the wage rate the TSA/LMA actually used, $22.13/hour, was correct, and matched the 80% of adjusted predisability earnings hourly rate

18

identified by Aetna in its claim analysis. (DPF ¶55 – 56). Moreover, the wages in the jobs identified in the TSA/LMA all were *greater* than the 80% rate – ranging from $52.94/hour to $25.21/hour. So the "error" in the TSA/LMA was both minor and immaterial – the analysis would have been the same had the vocational analyst typed "80%" rather than "60%" in the TSA/LMA report.[8]

The material and uncontroverted facts in the Administrative Record show that Aetna's decision that Plaintiff was not disabled from performing "any reasonable occupation" as of September 26, 2016 had rational support in the record and was based on a reasonable interpretation of the Plan terms and the evidence available. There is no evidence in the record that allows Plaintiff to argue that Aetna's decision was "downright unreasonable" or that Aetna's conclusions are arbitrary and capricious. This Court should therefore deny Plaintiff's Motion for Summary Judgment and enter summary judgment in favor of Aetna.

### D. Aetna Provided Plaintiff with a Full and Fair Review

The material and uncontroverted facts also show that Aetna provided Plaintiff with a full and fair review of his claim every step of the way. Aetna gave Plaintiff multiple opportunities to submit the information needed to review his initial claim, writing to Plaintiff repeatedly to request the information it needed. (DPF ¶18). Aetna conducted an in-depth review of the material submitted when it made its initial determination and provided Plaintiff with a detailed letter explaining the reasons for its decision and his right to appeal that decision. (DPF ¶23). When Plaintiff appealed, Aetna again provided Plaintiff with multiple extensions to gather and submit information to support his appeal, and gave additional time to Plaintiff's lawyer once he had been engaged to assist with Plaintiff's appeal. (DPF ¶25). Thereafter, Plaintiff was represented by legal

---

[8] The same is true for a matching mistake in Aetna's March 31, 2017 letter. While the letter quoted the wrong percentage, Aetna's TSA/LMA analysis used the correct adjusted rate.

counsel, who had every opportunity to submit materials to support Plaintiff's appeal. Plaintiff argues, without properly cited support, that his employer, the Plan Administrator, told him he need not submit a functional capacity examination in connection with his appeal. But this argument doesn't hold up. *First*, Aetna was not the Plan Administrator, and can't be deemed to have acted arbitrarily or capriciously due to the Plan Administrator's actions. Second, Plaintiff was represented by counsel on appeal, and was free to submit any materials he or his counsel believed could support his claim. Finally, given the absence of any medical data showing functional impairment, it is pure speculation to imply that a functional capacity evaluation would have changed the outcome here. Aetna was not arbitrary and capricious in this regard.

While Plaintiff claims that Aetna did not comply with ERISA's regulations that require it to review and consider Plaintiff's submission on appeal (see 29 CFR §2560.503-1(g)(3)(iv)(January's 2017 version)), the record does not support Plaintiff's argument. That Aetna's review on appeal found Plaintiff disabled under the "own occupation" Test of Disability shows that Aetna did fully and fairly consider Plaintiff's claim. See *Geiger*, 845 F.3d at 365 (finding Aetna's reinstatement of the plaintiff's benefits earlier showed the reasonableness of Aetna's procedures). Plaintiff's disagreement with part of Aetna's decision does not mean that Aetna did not give his claim a full and fair review. Plaintiff may not agree with all of the results of Aetna's review, but the process was fair.

The record shows that Aetna considered all of Plaintiff's medical conditions, which are painstakingly detailed in both Dr. Hill's lengthy reports and in Aetna's March 31, 2017 decision on appeal. (DPF ¶43 – 44, 62). Contrary to Plaintiff's assertions, Dr. Hill *did* consider Plaintiff's medication use, and as a result *did* restrict him from driving (among other activities). (DPF ¶49 – 50). Aetna's medical review was thorough and comprehensive, and Aetna looked in detail at the

*clinical facts* contained in the medical records, rather than the general descriptions provided by Dr. Ellias. For this reason, Plaintiff's criticism that Dr. Hill reviewed, but didn't "comment on" every single record or APS, falls flat. Dr. Hill's reports document and show that her review was comprehensive and considered all relevant information. And while Plaintiff criticizes Aetna for its follow-up inquiries about Dr. Hill's report, that action shows how carefully Aetna reviewed Plaintiff's claim.

Similarly, the TSA/LMA considered all of Plaintiff's skills and abilities to determine what potential jobs existed in a reasonable labor market. None of the potential exemplar jobs Aetna identified required activities beyond Plaintiff's restrictions. Contrary to Plaintiff's assertions, none of those potential jobs *required* Plaintiff to drive, nor were the jobs identified an exhaustive list of job's available in Plaintiff's labor market. Plaintiff's claim that it was unreasonable for Aetna to consider a "President/Owner" as a viable job for Plaintiff ignores his own self-reported work history. Plaintiff's claim that his business "never made a profit" is not supported by any evidence in the record. This argument also misses the point – the fact that the TSA/LMA identified potential jobs available (such as at Kimberly Clark or Boldt Construction) does not mean those were the only jobs available, or that Plaintiff was guaranteed to get those specific jobs. In fact, the TSA/LMA identified "136 manufacturing companies" within the geographic region, with the potential for multiple jobs that met the criteria for Plaintiff. (DPF ¶60). Similarly, while Plaintiff argues that the TSA/LMA was unfair because it did not take his carpel tunnel restrictions into account, the TSA/LMA expressly noted accommodations to address those restrictions, including in the specific "Supervisor, Order takers" job it identified. (DPF ¶58, 60).

Plaintiff's assertion that Aetna did not provide him with a full and fair review is not only unsubstantiated, it is directly contradicted by the record. For this additional reason, this Court should grant summary judgment in favor of Aetna.

### E. Plaintiff's Additional Criticisms of Aetna's Decision and Process Don't Withstand Scrutiny

The remainder of Plaintiff's criticisms of Aetna's decision don't pass muster either. While Plaintiff argues, for example, that Aetna's decision was tainted by a conflict of interest, he offers no evidence to suggest that Aetna's role as both the Plan insurer and claims fiduciary was by itself any sort of factor in Aetna's decision making. The record shows that Aetna, despite its "structural" conflict, conducted a thorough and comprehensive review of Plaintiff's claim at every step of the way. Plaintiff points to no evidence of bias to show that conflict of interest was a factor in Aetna's decision. *Des Armo*, 2014 WL 3860049, at *16 (recognizing structural conflict of interest is not a factor absence evidence of actual bias or a "borderline case"). The record also contains evidence of the steps Aetna took to safeguard the claims process from bias. Dr. Hill was an independent reviewer, with no connection to either party and no financial stake in the outcome of Plaintiff's claim. (DPF ¶53). Moreover, Aetna reversed its earlier decision and paid Plaintiff benefits for two years which further demonstrates its lack of bias. *Geiger*, 845 F.3d at 365. Nor does Plaintiff's unsupported argument that Aetna "acquired Coventry" such that the TSA/LMA was biased carry any weight. The Seventh Circuit has expressly recognized the legitimacy of Aetna's reliance on its own vocational analysts. See *Geiger*, 845 F.3d at 363. Nothing in the record suggests that conflict of interest can be a deciding factor here.

Similarly, Aetna was not required to defer to the opinions of Plaintiff's treating physicians. As this Court has observed, "…it is not arbitrary and capricious for the Plan Administrator to rely on its own consultant so long as it takes into consideration the entire record." *Des Armo* at *7,

citing *Black v. Long Term Disability Ins.,* 582 F.3d 738, 748 (7th Cir. 2009). See also *Black & Decker v. Nord*, 538 U.S. 822 (2003). Nor was Aetna required to obtain an in-person examination of Plaintiff. While the Plan allowed Aetna "the right" to seek an IME of Plaintiff, it did not *require* Aetna to do so. *Wallace v. Reliance Standard Ins. Co.*, 318 F.3d 723, 724 (7th Cir. 2003) (rejecting notion that insurer is required to send claimant to additional doctors); *Mommaerts v. Hartford Life and Accident Ins. Co.*, No. 05-C-0894, 2006 WL 1663754, at *4 (E.D. Wis. June 12, 2006) (Holding that insurer's decision not to obtain an IME "does not render its decision arbitrary and capricious."). Given the extensive medical records, Aetna was more than reasonable in relying on those records, and Dr. Hill's detailed review and analysis of same, to make its decision.

Nor was Dr. Hill's analysis in any way "flawed" due to her specialty in occupational medicine. Dr. Hill was a Diplomate of the American Board of Internal Medicine, a Diplomate of the American Board of Preventative Medicine, and Board Certified in Occupational Medicine. (DPF ¶43). She had the required experience and expertise to assess the medical aspects of Plaintiff's claim. It was therefore reasonable for Aetna to rely on her medical opinion. Even if Dr. Hill's *only* qualifications were in occupational medicine, however, Plaintiff's own (unsupported) definition of occupational medicine proves Aetna's good faith. Aetna was entirely reasonable in relying on Dr. Hill to assess Plaintiff's "health as a worker," including his "ability to perform as a worker." (Plaintiff's Mem. Of Law, p. 25). (Doc. 14). There is also no evidence in the record to substantiate Plaintiff's claim that Dr. Hill had no experience in the use of pain medications, or that she was unqualified to render an opinion on those issues. Indeed, Plaintiff's own records show doctors other than his pain specialist prescribing and opining about Plaintiff's use (and overuse) of those same pain medications prescribed by Dr. Ellias.

Finally, Plaintiff's claim that Aetna erred in how it calculated the benefits it paid him for the "own occupation" period of disability is not supported by the express language of the Policy. For eligible employees who are entitled to LTD benefits, the Policy identifies the "Scheduled Monthly LTD Benefit" as "60% of your monthly predisability earnings." (DPF ¶5). The Policy further states that "[t]he monthly benefit is an amount based on your monthly predisability earnings." (DPF ¶6). The Policy goes on to define predisability earnings:

> **Predisability Earnings**
>
> This is the amount of salary or wages you were receiving from an employer participating in this Plan on the day before a period of disability started, calculated on a monthly basis.
>
> \*      \*      \*      \*      \*
>
> If you are paid on an annual contract basis, your monthly salary is 1/12th of your annual contract salary.

(DPF ¶7) Emphasis in the original. The "adjusted predisability earnings" provision (which factors in a Consumer Price Index increase) does not apply to the amount of monthly benefit, but rather to the income threshold for satisfying the "any reasonable occupation" Test of Disability. (DPF ¶11). Aetna's calculation of the benefits it paid to Plaintiff was both reasonable and entirely correct.

None of Plaintiff's complaints about Aetna's decision or claims handling process withstand close scrutiny. For these additional reasons, this Court should deny Plaintiff's Motion for Summary Judgment and grant summary judgment in favor of Aetna.

> **F.     Even If This Court Were to Overturn Aetna's Decision, the Proper Remedy Would be Remand**

If this Court were to conclude that Aetna did not provide Plaintiff with a "full and fair" review of his claim, then the remedy here would be to remand the matter back to Aetna to reconsider Plaintiff's claim in light of the specific findings about Aetna's review. This is particularly so since Aetna's decision at issue was not one which terminated ongoing benefits under the same test of disability. *Aberg v. Charter Communications et al.*, No. 15-CV-571, 2016 WL 4444808 at *7 (E.D. Wis. August 23, 2016). In addition, Plaintiff relies heavily on the opinion of his pain specialist, Dr. Ellias, to argue that he remains disabled from working in any reasonable occupation. But Dr. Ellias relied on his characterization of Plaintiff's psychiatric condition to conclude he was unable to work. In his own motion papers, Plaintiff discusses the opinions of psychiatrist Dr. Azizi to support his claimed disability. In addition, the medical records in this matter discuss multiple instances of concern about Plaintiff's misuse and overuse of opioid medication, including one record noting Plaintiff's history of being on methadone maintenance. (DPF ¶29). Another record shows Plaintiff was discharged from a pain management practice for taking pain medication that did practice did not authorize. (DPF ¶34). All of these facts mandate that, if this Court concludes that Aetna's decisions were "downright unreasonable," Plaintiff's claim should be remanded back to Aetna to consider whether the Plan's 24 month limit on disability caused by psychiatric disorder or drug abuse will limit any benefits payable.

### G. Plaintiff is not Entitled to Interest or Fees

There can be no dispute that this matter involved a claimant with a complex medical history, and no dispute that Aetna carefully reviewed and considered all of the evidence before it. Even if this Court concludes that Aetna acted incorrectly here, there is no evidence in the record to suggest that Aetna's position was not "substantially justified," such that this Court should exercise discretion to award Plaintiff fees and interest. Under either "test" of whether fees can be

awarded under ERISA, the relevant question is "was the losing party's position substantially justified and taken in good faith, or was that party simply out to harass its opponent?" *Geiger v. Aetna Life Ins. Co.*, No. 15-cv-3791, 2016 WL 5391206, at \*3 (N.D. Ill. Sept. 27, 2016) (quoting *Kolbe & Kolbe Health and Welfare Plan v. Med. Coll. Of Wis., Inc.*, 657 F.3d 496, 506 (7th Cir. 2011)).  Aetna's decision here was substantially justified.  For this reason, this Court should decline to award any fees or other penalty to Plaintiff, even if it rules in his favor on his underlying claim.

Respectfully submitted,

**CHITTENDEN, MURDAY & NOVOTNY LLC**


By:\_\_\_\_/s/ Elizabeth G. Doolin_____
            Elizabeth G. Doolin (IL 6210358)
303 West Madison Street, Suite 1400
Chicago, IL  60606
(312) 281-3600
edoolin@cmn-law.com
**Attorneys for Defendant**

Dated: March 28, 2019

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on **March 28**, **2019**, I electronically filed the foregoing **Defendant's Memorandum of Law in Response to Plaintiff's Motion for Summary Judgment and in Support of Defendant's Cross-Motion for Summary** herein with the Clerk of the United States District Court for the Eastern District of Wisconsin, using the CM/ECF system which sent notification of such filing to the following registered CM/ECF participants:

> Mary C. Flanner
> Nola J. Hitchcock Cross
> 845 North 11th St.
> Milwaukee, Wisconsin 53233
> mflanner@crosslawfirm.com
> njhcross@crosslawfirm.com

Respectfully submitted,

**CHITTENDEN, MURDAY & NOVOTNY LLC**

By:    /s/ Elizabeth G. Doolin
       Elizabeth G. Doolin (IL 6210358)
303 West Madison Street, Suite 1400
Chicago, IL 60606
(312) 281-3600
edoolin@cmn-law.com
**Attorneys for Defendant**