UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

CHRISTOPHER WILCOX,

            Plaintiff,

    v.                              Case No. 18-C-463

AETNA LIFE INSURANCE COMPANY,

            Defendant.

## DECISION AND ORDER

Plaintiff Christopher Wilcox brought this action for judicial review of the denial of his claim for long-term disability (LTD) benefits by Defendant Aetna Life Insurance Company under section 502(a)(1)(B) of the Employee Retirement Income Security Act (ERISA). Wilcox asserts that Aetna's decision was arbitrary and capricious while Aetna contends that it made its decision after a full and fair review. The court has jurisdiction over this case under 29 U.S.C. § 1132. Currently before the court are cross motions for summary judgment and Wilcox's unopposed motion for leave to file documents with restricted electronic access. For the reasons that follow, Aetna's motion for summary judgment will be granted, Wilcox's motion for summary judgment will be denied, and the case will be dismissed.

## BACKGROUND

Starting in 2004, Wilcox was employed full time as a life and property insurance sales person for McCormick, Klessig & Assoc., Ltd. primarily selling life and commercial property insurance. Aetna issued an ERISA-governed employee welfare plan (the Plan) to Wisconsin

Manufacturers & Commerce, Inc. Wilcox's employer was a participating employer under the policy as well as the Plan Administrator, though Aetna administered claims under the Plan.

The Plan provides, in relevant part, the following:

**Test of Disability**

From the date that you first become disabled until the end of the Own Occupation Period, you will be deemed to be disabled on any day if:

- You are not able to perform the **material duties** of your **own occupation** solely because of: disease or **injury**; and
- Your work earnings are 80% or less of your **adjusted predisability earnings**.

After the Own Occupation Period, you will be deemed to be disabled on any day if you are not able to work at any **reasonable occupation** solely because of:

- Disease; or
- Injury.

If your **own occupation** requires a professional or occupational license or certification of any kind, you will not be deemed to be disabled solely because of the loss of that license or certification.

Administrative Record (AR) 2242, Dkt. No. 17-7 at 148. The "own occupation period" is defined in the Plan as "[t]he first 24 months that a Monthly Benefit is payable during a period of disability." AR 2233, Dkt. No. 17-7 at 139. The Plan defines a "reasonable occupation" as "any gainful activity for which you are; or may reasonably become; fitted by: education; training; or experience; and which results in; or can be expected to result in; an income of more than 80% of your **adjusted predisability earnings**." AR 2259, Dkt. No. 17-7 at 165.

On September 9, 2014, Wilcox initiated a claim for LTD benefits under the Plan. Aetna solicited further information from Wilcox in September. Aetna also faxed an Attending Physician's Statement (APS) form to Dr. Mazin Ellias, Wilcox's pain specialist, and was informed that Dr.

2

Ellias was out of the office and unable to complete the APS. In October, Aetna received an APS from Dr. Mark Szmanda—Wilcox's neurologist—dated October 31, 2014, wherein he identified spinal degeneration and post-concussion syndrome as Wilcox's medical conditions. Regarding Wilcox's abilities and limitations, Dr. Szmanda wrote "defer" and did not fill out any of the fields in that section. Over the course of the next three months, Aetna spoke with Wilcox over the phone and requested information from Wilcox's employer.

On March 24, 2015, after its medical consultants reviewed the records submitted by Wilcox, Aetna advised Wilcox in writing that it denied his claim, finding that Wilcox was not disabled from performing both his own occupation as well as a reasonable occupation. Aetna stated:

> In view of the above, we have determined that the medical information on file fails to support a functional impairment from your own occupation. Despite numerous diagnoses which have changed over time, we do not have a provider willing to speak to impairment. While Dr. Szmanda completed a portion of the Attending Physician Statement it is unclear if he is disabling you from work activity. A note from Dr. John Myers an internal medicine provider indicates that he is not willing to complete disability paperwork. At this time, we are unable to accept liability on your Long Term Disability application and it has been denied.

AR 1875, Dkt. No. 17-6 at 169.

Wilcox appealed Aetna's decision on September 22, 2015, arguing that he was disabled from performing his own occupation and any reasonable occupation as defined by the Plan. Wilcox requested multiple extensions to submit information related to his appeal and to obtain legal counsel, which Aetna granted. Among the additional information submitted was a second APS from Dr. Szmanda dated April 23, 2015, an APS from Dr. Kneeland dated August 17, 2015, and a letter and APS from Dr. Ellias dated December 30, 2016.

Dr. Szmanda identified low back pain, fibromyalgia, and lumbar stenosis as conditions that impaired Wilcox, and indicated that Wilcox was capable of performing light work with the following limitations: no driving due to pain medication, no sitting in a chair for more than two hours due to leg and back pain as well as weakness, and no standing for more than one hour. AR 467–68, Dkt. No. 17-2 at 207–08. Dr. Szmanda limited Wilcox to working two hours a day, five days a week and listed pain and medication as objective findings that substantiate impairment. *Id.*

Dr. Kneeland identified the same limiting conditions as Dr. Szmanda and also indicated Wilcox would be capable of performing light work, but did not check any boxes indicating the number of hours and days Wilcox could work. AR 471–72, Dkt. No. 17-2 at 211–12. Dr. Kneeland listed generalized fatigue, muscle pain, and medication side effects as objective findings that substantiate impairment. *Id.* Dr. Kneeland did not check any boxes related to the number of hours and days Wilcox could work, and instead deferred to Dr. Szmanda's recommended limitations. *Id.*

Dr. Ellias identified cervical/lumbar spine degenerative joint disease and musculoskeletal knee/shoulder and side effects from medication—slow reaction time as well as mental and psychological effects—as conditions that impaired Wilcox. AR 484, Dkt. No. 17-2 at 224. Dr. Ellias indicated Wilcox had no ability to work. AR 485, Dkt. No. 17-2 at 225. In his letter, Dr. Ellias stated Wilcox's restrictions are both physical, restricting him "to sedentary type of work," and cognitive side effects of his medications that "further impair his judgment/reaction time." AR 479, Dkt. No. 17-2 at 219. Dr. Ellias opined that these limitations, combined with the personality dysfunction identified by Dr. Azizi, "make it impossible" for Wilcox to return to gainful employment. *Id.* In addition to these APS forms, Wilcox submitted medical records from multiple providers dating back to 2009.

4

Aetna obtained an independent medical review from Dr. Chalonda Hill, who was hired by a third-party vendor. Dr. Hill is board certified in occupational medicine and holds a diploma from the American Board of Internal Medicine and the American Board of Preventative Medicine. Dr. Hill submitted a report, dated February 1, 2017, based on her review of Wilcox's medical records that spanned from June 14, 2014, to December 30, 2016. As part of the report, Dr. Hill also spoke with Dr. Ellias, who informed her that Wilcox (1) suffers from cervical and lumbar pain due to degenerative disc disease; (2) has been treated with radiofrequency ablation and opioid medications; (3) has limited range of motion of the cervical and lumbar spine due to his conditions; and (4) suffers from seizure disorder. AR 447, Dkt. No. 17-2 at 187. Dr. Hill noted Dr. Ellias' opinion in her report:

> It is Dr. Ellias' opinion that due to cervical and lumbar degenerative disc disease, decreased range of motion combined with seizure disorder, he is unsure if he is able to function in any job. He also notes a psychological aspect involving stress may play a role in limiting his abilities.

*Id.*

Based on her review of the records, Dr. Hill opined that Wilcox was functionally limited from June 10, 2014, to the present due to cervical degenerative disc disease, lumbar degenerative disc disease, seizure disorder, bilateral knee degenerative joint disease, left avulsion distal fracture of distal fibula, failed back syndrome, and long-term opioid use. *Id.* Dr. Hill stated that Wilcox was capable of full-time work with the following restrictions:

> Able to sit up to 1 hour at a time for a total of 8 hours per day. Allow for 5 minute breaks after sitting one hour for position change.

> Able to walk up to 20 minutes at a time for a total of 2 hours per day.

> Able to stand up to 30 minutes at a time for a total of 2 hours per day.

Occasionally — lifting/carrying up to 20 lbs., pushing/pulling up to 25 lbs., bend, twist, squat, reach (above shoulder, at desk level, below desk level), simple grip and firm grasp, climb one flight of stairs, use lower extremities for operation of foot controls.

Never — work at unprotected heights, work near open bodies of water, kneel, crawl, climb ladders, drive, operate heavy machinery.

AR 448, Dkt. No. 17-2 at 188. Dr. Hill further stated the clinical evidence did not support functional impairments related to Wilcox's co-morbid conditions, which include chronic sinusitis, autoimmune hepatitis, pulmonary interstitial disease, prostatitis, GERD, urinary urgency/incontinence, fibromyalgia, BPH, and hypothyroidism. *Id.* As to Wilcox's cognitive and functional impairments due to the effects of the opioids Wilcox was taking to manage his pain, Dr. Hill stated the medical records supported a finding of functional impairments. She indicated that her clinical impression was narcotic dependence, hypertension, and lethargy, and reiterated that Wilcox should never work at unprotected heights, work near open bodies of water, kneel, crawl, climb ladders, drive, or operate heavy machinery. *Id.*

After receiving Dr. Hill's report, Aetna sought clarification from the vendor that had hired Dr. Hill regarding the following: (1) Was Wilcox able to work full time with the assessed restrictions and limitations the vendor provided from June 20, 2014, to the present or was he totally limited from any job from June 20, 2014, to the present or a particular date; and (2) Under what period based on his treatment would the restrictions and limitations apply. AR 425, Dkt. No. 17-2 at 165. The vendor stated that Dr. Hill's report answers those questions, citing the portion of the report listing Wilcox's conditions that limit his functionality from June 10, 2014, to the present and

the portion listing the restrictions to Wilcox's ability to work full time. AR 422–23, Dkt. No. 172 at 162–63.

Dr. Hill later submitted a supplemental report to further clarify her initial report. She noted in the supplemental report that Wilcox's medications include OxyContin, Oxycodone, and Keppra. AR 400, Dkt. No. 17-2 at 140. Doctor Hill stated there is a lack of medical evidence to support a finding that Wilcox's medication caused cognitive impairments, impairment secondary to medication side effects from September 27, 2016, to March 22, 2017, and impairment secondary to medication side effects during the same time period that would prevent Wilcox from performing activities of daily living or full-time work. *Id.*

In addition to requesting additional supplementation regarding Dr. Hill's initial report, Aetna also sought a Transferrable Skills Analysis/Labor Market Analysis (TSA/LMA, hereinafter the Vocational Report), resulting in a March 3, 2017 report completed by Coventry. The report listed Wilcox's work experience, education, and training from a questionnaire submitted by Wilcox. Based on the functional limitations recommended by Dr. Hill, a sedentary physical demand level was utilized for the analysis of potential jobs and took into account the functional restrictions Dr. Hill listed in her report. The target hourly wage for comparable jobs was $22.13, as that would satisfy the 80% threshold earnings test provided by the Plan based on Wilcox's annual salary of $57,200.04. The labor market considered was a 100-mile radius around Deerbook, Wisconsin, even though Wilcox was living in Neenah at the time. Included within this area is Green Bay, Wisconsin. The report stated Wilcox's transferable skills included directing others, record keeping, scheduling abilities, attention to detail, ability to work to set tolerances, communication skills, customer service, knowledge of insurance principles, knowledge of sales abilities, insurance policy

information and parameters, and ability to work as a team member to achieve departmental goals and objectives.

The report identified one closest match, one good match, and multiple fair and potential matches within the skills, functional abilities, and wage restrictions. The three occupational titles identified by the analysis were president/owner; supervisor, order takers; and customer service supervisor—all of which have a statewide hourly wage in Wisconsin above $22.13. The report concluded that these three occupations are noted to be within 100 miles of Deerbrook, Wisconsin, consistent with Wilcox's transferable skills, and met all the required criteria, "including reasonable wage, education, experience, training and physical capacity." AR 408, Dkt. No. 17-2 at 148.

On March 31, 2017, Aetna made a decision regarding Wilcox's appeal partially overturning its original decision. Aetna found that, from September 27, 2014, through September 26, 2016, Wilcox was functionally impaired from performing his own occupation as an insurance salesman and was therefore entitled to benefit payments for that period of time. Although it overturned its decision regarding Wilcox's ability to perform his own occupation, based on the information available in the claim file during the appeal review, Aetna concluded that Wilcox was not eligible for additional benefit payments beyond September 26, 2016, because he was able to work in a reasonable occupation as defined by the Policy after that date despite his restrictions. Aetna's report stated in part that:

- Wilcox was functionally limited as of July 10, 2014, due to cervical degenerative disc disease, lumbar degenerative disc disease, seizure disorder, bilateral knee degenerative joint disease, left avulsion distal fracture of distal fibula, failed back syndrome, and long term opioid use.

- The clinical evidence did not support functional impairments based on Wilcox's co-morbid conditions that include chronic sinusitis, autoimmune

hepatitis, pulmonary interstitial disease, prostatitis, GERD, urinary urgency/incontinence, fibromyalgia, BHP, hypothyroidism, and depression.

- • There is a lack of clinical evidence to support cognitive impairment secondary to medication side effects from Wilcox's prescriptions of OxyContin, Oxycodone, and Keppra, that would prevent Wilcox from performing his activities of daily living.

- • Wilcox was capable of full-time work with the restrictions identified by Dr. Hill.

AR 2211–16, Dkt. No. 17-7 at 117–22. After Aetna made its decision, Wilcox filed this lawsuit on March 23, 2018, challenging Aetna's determination that he was capable of performing a "reasonable occupation" as defined in the Plan and thus not entitled to benefits from September 27, 2016, forward.

## LEGAL STANDARD

### A. Summary Judgment Standard of Review

Summary judgment should be granted when the moving party shows that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). In other words, the time and expense of the parties and the court should not be wasted on a trial when there are no material facts in dispute, one party is entitled to judgment on those facts, and thus there is nothing to try. In deciding a motion for summary judgment, all reasonable inferences are construed in favor of the nonmoving party. *Foley v. City of Lafayette*, 359 F.3d 925, 928 (7th Cir. 2004). The party opposing the motion for summary judgment must "submit evidentiary materials that set forth specific facts showing that there is a genuine issue for trial." *Siegel v. Shell Oil Co.*, 612 F.3d 932, 937 (7th Cir. 2010) (quoted source and internal quotation marks omitted). "The nonmoving party must do more than simply show that there is some metaphysical doubt as to the material facts." *Id.* Summary judgment is properly entered against a

party "who fails to make a showing sufficient to establish the existence of an element essential to the party's case, and on which that party will bear the burden of proof at trial." *Parent v. Home Depot U.S.A., Inc.*, 694 F.3d 919, 922 (7th Cir. 2012) (internal quotation marks omitted) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986)).

## B. ERISA Standard of Review

"A denial of benefits normally is reviewed de novo 'unless the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan.'" *Edwards v. Briggs & Stratton Ret. Plan*, 639 F.3d 355, 360 (7th Cir. 2011) (quoting *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 115 (1989)). "In such a case, the denial of benefits is reviewed under an 'arbitrary and capricious' standard." *Id.* (quoting *Hess v. Reg-Ellen Mach. Tool Corp. Emp. Stock Ownership Plan*, 502 F.3d 725, 727 (7th Cir. 2007) (footnote omitted)). Here, the parties are in agreement that the Plan vests Aetna with discretionary authority and that the arbitrary and capricious standard applies.

"Under the arbitrary and capricious standard, the reviewing court must ensure only that a plan administrator's decision 'has rational support in the record.'" *Id.* (quoting *Semien v. Life Ins. Co. of N. Am.*, 436 F.3d 805, 812 (7th Cir. 2006)). "Put simply, an administrator's decision will not be overturned unless it is 'downright unreasonable.'" *Id.* (quoting *Davis v. Unum Life Ins. Co. of Am.*, 444 F.3d 569, 576 (7th Cir. 2006)). "However, '[r]eview under the deferential arbitrary and capricious standard is not a rubber stamp and deference need not be abject.'" *Id.* (quoting *Hackett v. Xerox Corp. Long–Term Disability Income Plan*, 315 F.3d 771, 774 (7th Cir. 2003)). "Nevertheless, we will uphold the plan's decision 'as long as (1) it is possible to offer a reasoned explanation, based on the evidence, for a particular outcome, (2) the decision is based on a

reasonable explanation of relevant plan documents, or (3) the administrator has based its decision on a consideration of the relevant factors that encompass the important aspects of the problem.'" *Id.* (quoting *Hess v. Hartford Life & Accident Ins. Co.*, 274 F.3d 456, 461 (7th Cir.2001) (internal quotations omitted)). "The court must also be mindful of the conflict of interest that can exist when the administrator has both the discretionary authority to determine eligibility for benefits and the obligation to pay benefits when due." *Des Armo v. Kohler Co. Pension Plan,* No. 13-C-436, 2014 WL 3860049, at *5 (E.D. Wis. Aug. 6, 2014) (citing *Metro. Life Ins. Co. v. Glenn*, 554 U.S. 105, 108 (2008)). The court must "consider that conflict as a factor in determining whether the plan administrator has abused its discretion in denying benefits," and the conflict of interest is "weighed as a factor in determining whether there is an abuse of discretion." *Glenn*, 544 U.S. at 108.

## ANALYSIS

**A.      Aetna Decision**

Wilcox contends that Aetna's decision was arbitrary and capricious because it: discredited the APS forms from his treating physicians without explanation, did not account for the effects of his pain on his ability to work, did not minimize its structural conflict of interest, and is required to pay more on the benefits it has paid to him based on its finding that he is disabled from performing his past occupation.

**1.      Aetna considered Wilcox's medical conditions**

Wilcox contends that Aetna did not adequately account for his limitations due to his medical conditions, his resulting pain, and the effects of the medications that he takes to treat the pain. Regarding Wilcox's complaints of pain, "[s]ubjectively painful conditions like CRPS and fibromyalgia pose difficult problems for private disability insurance plan administrators and the

Social Security Administration, who understandably seek to make decisions based on the most objective evidence available." *Holmstrom v. Metro. Life Ins. Co.*, 615 F.3d 758, 769 (7th Cir. 2010). The Seventh Circuit has "rejected as arbitrary an administrator's requirement that a claimant prove her condition with objective data where no definitive objective test exists for the condition or its severity." *Id.* (citing *Hawkins v. First Union Corp. Long–Term Disability Plan*, 326 F.3d 914, 918–19 (7th Cir. 2003) (reversing denial of benefits where administrator determined that there were "no objective findings to support restrictions" and noting that pain often cannot be detected by laboratory tests and that the amount of pain and fatigue that a particular case produces cannot be tested objectively); *Diaz v. Prudential Ins. Co. of Am.*, 499 F.3d 640, 646 (7th Cir. 2007) (claimant's pursuit of extensive treatment including heavy medication and repeated surgical procedures "supports an inference that his pain, though hard to explain by reference to physical symptoms, was disabling")). In cases involving subjective symptoms of pain, however, the Seventh Circuit has allowed the "plan administrator to require a certain degree of 'objectivity' in terms of the measurement of physical limitations as observed in a functional capacity evaluation." *Id.* at 769–70. "A distinction exists . . . between the amount of fatigue or pain an individual experiences, which as *Hawkins* notes is entirely subjective, and how much an individual's degree of pain or fatigue limits his functional capabilities, which can be objectively measured." *Williams v. Aetna Life Ins. Co.*, 509 F.3d 317, 322 (7th Cir. 2007). In *Williams*, the court upheld a denial of benefits because the record "lacked any specific data" reflecting the plaintiff's functional impairment. *Id.* at 323. The court held "the Plan's denial of benefits to [the plaintiff] on the basis of [a treating physician's] failure to provide accurate information detailing how [the plaintiff's] fatigue limited his functional abilities was not arbitrary and capricious." *Id.* at 323–24; *see also Holmstrom*, 615

F.3d at 760 (discussing *Williams* and stating the court reached its decision "because no specific tests of physical ability or endurance were ever performed").

Here, the record does not contain results from specific tests that objectively demonstrate Wilcox's limitations due to the pain that he experiences as a result of his conditions. Although Dr. Kneeland and Dr. Szmanda indicated in their APS forms that pain and fibromyalgia were conditions that impaired Wilcox, they do not cite any objective evidence in support of their limitations. Regarding Wilcox's limitations due to his back, Aetna and Dr. Hill adopted the limitations set forth by Dr. Szmanda regarding the amount of time Wilcox is able to sit and stand. And even though Wilcox did receive a referral for surgery related to his carpal tunnel, there are no objective test results in the administrative record that set forth exactly how his grip, dexterity, and ability to use his hands are limited.

Regarding the side effects of Wilcox's medication, Aetna and Dr. Hill did account for them. In her initial report, Dr. Hill emphasized that Wilcox should never work at unprotected heights, work near open bodies of water, kneel, crawl, climb ladders, drive, or operate heavy machinery based on the impairments caused by his medication side effects. While Wilcox cites to evidence of lethargy and other symptoms that are alleged to be caused by the medication, there is evidence in the record that Wilcox was overmedicated. AR 742, Dkt. No. 17-3 at 210 ("I really strongly feel that he is overmedicated, and he should get back down on his baclofen and cyclobenzaprine, as well as try to go down on his clonazepam and [on his] narcotics."); AR 735, Dkt. No. 17-3 at 203 ("I really think that starting with some of his meds, he really needs to back off. . . . I really think the patient would live a better [life] and do better if we back off some of the medications that he is on. He was not overly receptive to this, but he agreed to try to get rid of the Lyrica because he does not

think it helps him."); AR 774, Dkt. No. 17-3 at 242 (drug screening results showed positive test result for diazepam for which he did not have a current prescription, resulting in Wilcox no longer being prescribed controlled substances).

Regarding the episodes of syncope that Wilcox experienced in 2016, there was no definitive diagnosis of a seizure disorder at the time Aetna and Dr. Hill conducted their review and testing showed normal results. AR 1131, Dkt. No. 17-4 at 189 (CT scan shows "[n]o acute intracranial abnormality" or other significant findings); AR 1124, Dkt. No. 17-4 at 182 (stating "it's very likely that [Wilcox] could've lost consciousness due to overmedication"); AR 867–68, Dkt. No. 17-3 at 335–36 ("continuous EEG showed absolutely no seizures whatsoever or even any underlying epileptiform activity that would predispose the patient to having a seizure" and reported no prior history of seizures).

Wilcox also asserts that Aetna discredited the opinions of his treating physicians without providing an explanation. But "[n]othing in [ERISA] suggests that plan administrators must accord special deference to the opinions of treating physicians. Nor does the Act impose a heightened burden of explanation on administrators when they reject a treating physician's opinion." *Black & Decker Disability Plan v. Nord*, 538 U.S. 822, 831 (2003). " However, a plan's determination must still have a reasoned basis to survive judicial review, even under the deferential standard of review. Administrators may not arbitrarily refuse to credit a claimant's reliable evidence, including opinions of a treating physician." *Holmstrom*, 615 F.3d at 774–75 (citing *Nord*, 538 U.S. at 835). Here, Aetna did provide a basis:

> Based on our appeal review, there are insufficient physical and psychological findings (i.e. abnormal physical exam findings, abnormal results, diagnostic test results, physical examination with range of motion testing in degrees, motor strength

> testing, and neurologic findings, formal mental status examination findings, performance based test of psychological functioning with standardized scores, behavioral observations with frequency, duration, and intensity of symptoms observed, etc.) to support Mr. Wilcox's inability to work at any occupation in a full time basis from September 27, 2016.

AR 2214, Dkt. No. 17-7 at 120. In addition, Aetna and Dr. Hill did not outright reject the opinions of the treating physician. Two of them, Dr. Szmanda and Dr. Kneeland, indicated that Wilcox was capable of light work, which is more demanding than Aetna's decision to limit Wilcox to sedentary work. In addition, Dr. Ellias stated in his letter that Wilcox's physical restrictions due to his back issues would only limit him to sedentary work. The limitations recommended by Dr. Hill and adopted by Aetna regarding the duration Wilcox is able to sit and stand in a day, as stated earlier, aligns with Dr. Szmanda's recommendation. To the extent Dr. Hill and Aetna disregarded the opinions of the treating physicians, Wilcox has not identified an objective test that supports a limitation stricter than those adopted by Aetna. As Aetna considered all of the evidence in the record, accounted for Wilcox's limitations that are supported by the objective portions of the record, "its decision—although certainly not indisputable—[is] reasonable, which is all that is required." *Speciale v. Blue Cross & Blue Shield Ass'n*, 538 F.3d 615, 624 (7th Cir. 2008) (citing *Davis*, 444 F.3d at 576–77 ("The judicial task here is not to determine if the administrator's decision is correct, but only if it is reasonable."); *Sisto*, 429 F.3d at 701 ("Raising debatable points does not entitle [the claimant] to a reversal under the arbitrary-and-capricious standard.")). As such, Aetna's assessment of Wilcox's medical conditions was not arbitrary and capricious.

### 2. Aetna minimized any conflict of interest

Wilcox contends that "[s]ince Aetna is both the payor of claims, the adjudicator of claim eligibility, and selected Coventry, a company that [it] owns to perform the vocational assessment,

15

it has an inherent conflict of interest." Pl.'s Br., Dkt. No. 14 at 9. As is the case here, where a benefits plan vests discretionary authority in an administrator that is "authorized both to decide whether an employee is eligible for benefits and to pay those benefits," the resulting "conflict must be weighed as a 'factor in determining whether there is an abuse of discretion.'" *Glenn*, 544 U.S. at 111 (quoting *Firestone Tire & Rubber Co.*, 489 U.S. at 115). It is "not the existence of a conflict of interest . . . but the *gravity* of the conflict, as inferred from the circumstances, that is critical." *Marrs v. Motorola, Inc.*, 577 F.3d 783, 789 (7th Cir. 2009). Conflicts "carry less weight when the insurer took active steps to reduce potential bias and to promote accuracy." *Raybourne v. Cigna Life Ins. Co. of New York*, 700 F.3d 1076, 1082 (7th Cir. 2012). Specifically, a court should consider "the reasonableness of the procedures by which the plan administrator decided the claim [and] any safeguards the plan administrator has erected to minimize the conflict of interest." *Majeski v. Metro. Life Ins. Co.*, 590 F.3d 478, 482 (7th Cir. 2009).

Aetna took reasonable measures to minimize any conflict of interest in Wilcox's case. Aetna hired Dr. Hill to perform an independent medical review of Wilcox's records. In addition, Aetna followed up with Dr. Hill regarding further questions that it had regarding the effects of Wilcox's medication. "It is not arbitrary and capricious for the Plan Administrator to rely on its own consultant so long as it takes into consideration the entire record." *Des Armo*, 2014 WL 3860049, at *7 (citing *Black v. Long Term Disability Ins.*, 582 F.3d 738, 748 (7th Cir. 2009)). Aetna also obtained a Vocational Report to assess Wilcox's potential to find employment in a reasonable occupation. Based on the assessments from these third parties, Aetna reversed its original determination that Wilcox could still perform his own occupation. Safeguards such as these have been found sufficient to minimize any conflict of interest. *See Geiger v. Aetna Life Ins. Co.*,

845 F.3d 357, 365 (7th Cir. 2017).  Consequently, Aetna took adequate safeguards to minimize any conflict of interest.

> **3.      Aetna was not required to pay interest on past due amounts or make annual consumer price index adjustments on its payment to Wilcox for LTD benefits**

Wilcox contends that Aetna's payment of $68,640 to him for LTD benefits based on his inability to work in his own occupation failed to include any interest payment for the past due benefits.  Wilcox further asserts that Aetna "failed to increase the amount payable as required by the policy with an annual adjustment as of January 1 based on the consumer price index (CPI)."  Pl.'s Br., Dkt. No. 28 at 14.

Based on the terms of the Policy, Wilcox is not entitled to interest for the LTD benefits and Aetna was not required to adjust the amount payable based on the CPI.  The Policy defines "Scheduled Monthly LTD Benefits" as "60% of your monthly predisability earnings."  AR 2233, Dkt. No. 17-7 at 139.  The Policy defines "predisability earnings" as

> the amount of salary or wages you were receiving from an employer participating in this Plan on the day before a period of disability started, calculated on a monthly basis.
>
> . . .
>
> If you are paid on an annual contract basis, your monthly salary is 1/12th of your annual contract salary.

AR 2258, Dkt. No. 17-7 at 164.  Although the Policy has a provision for adjusted predisability earnings, which does factor in annual CPI increases, it only applies to the income threshold in relation to the reasonable occupation provision, not the payment of LTD monthly benefits.[1]  Because

---

[1]  The Plan defines "adjusted predisability earnings" as follows:

This is your **predisability earnings** plus any increase made on each January 1,

the Plan does not provide for interest or for annual CPI adjustments for payments of monthly LTD benefits, Aetna was not required to include them in its payment to Wilcox.

## B.     Doctor Hill

Wilcox asserts that Dr. Hill was not qualified to assess his medical conditions because her background is in occupational medicine.  In particular, Wilcox points to the fact that he saw a pain management specialist to treat his chronic pain and Dr. Hill does not have the same specialization. ERISA's regulations state:

> In deciding an appeal of any adverse benefit determination that is based in whole or in part on a medical judgment, . . . the appropriate named fiduciary shall consult with a health care professional who has appropriate training and experience in the field of medicine involved in the medical judgment.

29 C.F.R. § 2560.503-1(h)(3)(iii).  The fact that Dr. Hill is not a pain management specialist, however, does not mean that she is not qualified to assess Wilcox's conditions and, more importantly, determine what he is and is not capable of doing in a work environment as a result. *Shields v. Matrix Absence Mgmt., Inc.*, No. 06-CV-1314, 2008 WL 4443118, at *6 (E.D. Wis. Sept. 24, 2008), *amended in part sub nom. by Shields v. Aurora Health Care Long Term Disability Plan*, No. 06-CV-1314, 2009 WL 2883041 (E.D. Wis. Sept. 4, 2009) ("Dr. Ladin may not be a rheumatologist but, as a medical doctor with experience in pain medicine, he is amply qualified to review the records of rheumatologists and other specialists and make an informed finding."); *see generally Mote v. Aetna Life Ins. Co.*, 502 F.3d 601, 607–08 (7th Cir. 2007) (holding

---

starting on the January 1 following 12 months of a period of disability.  The increase on each such January 1 will be by the percentage increase in the **Consumer Price Index** rounded to the nearest tenth; but not by more than 10%.

AR 2256, Dkt. No. 17-7 at 162.

administrator's decision not arbitrary and capricious even though it did not use rheumatologists to review file of claimant alleging disability as a result of, among other things, fibromyalgia). Accordingly, Dr. Hill was qualified to assess Wilcox's medical conditions.

## C. Coventry's Vocational Report

Wilcox contends that the Vocational Report produced by Coventry and relied upon by Aetna was unreasonable because (1) it improperly assessed his transferable skills and identified positions that he was not capable of performing, (2) the Vocational Report looked at improper geographic locations for potential jobs, and (3) the Vocational Report used an incorrect wage rate.

### 1. The Vocational Report prepared by Coventry reasonably assessed Wilcox's transferable skills and possible positions that satisfied the Plan's reasonable occupation provision

Wilcox first asserts that Coventry's Vocational Report is flawed because it assumed the correctness of Dr. Hill's report and the functional restrictions contained within. In addition, Wilcox contends the Vocational Report is flawed because Dr. Hill's report contains no mention of Wilcox's limitations due to his shoulders or hands. As discussed earlier, Dr. Hill's report was not flawed. Thus, Coventry's reliance on it was appropriate. Regarding his shoulder, Wilcox has not identified any portion of the administrative record that identifies any functional restrictions related to his shoulder. Although Wilcox contends that he received a surgery referral for his shoulder, the medical record cited in support of that claim, dated August 23, 2016, merely states "[Wilcox has] had several surgeries on his left shoulder and arm from Dr. Shawn Hennigan and is having some concerns. Therefore he's referred back to discuss those with Dr. Hennigan." AR 1095, Dkt No. 17-4 at 153.

Turning to Wilcox's hands, his most recent medical record states, "Left hand has Wanger stage II wasting of the intrinsics on the left side. Has significant weakness with intrinsics is unable to cross the index over the middle finger. Has a positive Tinel's at the elbow has a positive Durkin's compression test at the wrist." AR 1138, Dkt. No. 17-4 at 196. Based on this examination, the physician recommended the following:

> At this point I do think after failing conservative therapy for both of the above that it would make sense to do a carpal and cubital tunnel release the same setting he does want his elbow operated on by Dr. Hennigan up at Baycare we will have him see Dr. Hennigan up there and most likely he will go ahead with carpal and cubital tunnel and left side.

*Id.* These records do not provide for any restriction or limitation based on Wilcox's conditions affecting his hands, nor are there any objective tests in the record that measure or establish any limitations based on this diagnosis. Consequently, there was no need to accommodate this condition. Notwithstanding that fact, one of the occupations identified by Coventry in the Vocational Report—Supervisor, Order Takers— provides for ways to minimize the use of Wilcox's upper extremities: "With the use of voice activated software, this would further minimize the use of the upper extremities for this position. The fact that this occupation is a supervisory position can allow for varied activities involved to further minimize use of the upper extremity as well." AR 407, Dkt. No. 17-2 at 147.

Wilcox next asserts that all three of the positions identified in the Vocational Report require and assumed skills and experience as a supervisor that he does not possess. But Wilcox indicated on a Work History and Education Questionnaire that supervision of others was part of his job as the president of a home business that he ran performing computer repairs and web design work. In addition, the Plan defines "reasonable occupation" as "any gainful activity for which you are; *or*

*may reasonably become*; fitted by: education; training; or experience." AR 2259, Dkt. No. 17-7 at 165 (emphasis added). Given that Wilcox indicated he had prior experience supervising others, although possibly not to the same extent as would be required for the positions identified in the Vocational Report, there is nothing in the administrative record that indicates Wilcox was incapable of acquiring the necessary skills to supervise others or to perform the requirements of the positions through education, training, or experience. *See Geiger v. Aetna Life Ins. Co.*, 845 F.3d 357, 361 (7th Cir. 2017) (holding that identification of occupations plaintiff had not performed but are ones that plaintiff "'may reasonably become' fitted by education, training, or experience" was reasonable).

Lastly, Wilcox contends that the three positions identified in the Vocational Report—President/Owner; Supervisor, Order Takers; and Customer Service Supervisor—are unreasonable. In particular, Wilcox focuses on President/Owner, and the fact that the report identified job position openings as president of Kimberly Clark and Boldt as viable options for Wilcox. A "requirement that no 'reasonable occupation' be available to Plaintiff does not mean that Defendant must identify a particular job opening for Plaintiff or prove that Plaintiff actually would secure that job." *Halley v. Aetna Life Ins. Co.*, 141 F. Supp. 3d 855, 870 (N.D. Ill. 2015). Rather, "the Seventh Circuit has found that no occupation is available to a disabled employee when he is not able to meet that demands of that occupation due to his disability." *Id.* For instance, it is unreasonable to state that a plaintiff would be capable of performing a job that requires an employee to work more than eight hours a day when the employee is limited to working only 8 hours a day. *Id.* at 870–71 (holding that a job that requires an employee to work more hours than able due to physical restrictions and limitations is not available as a "reasonable occupation"). Although

President/Owner is not a reasonable occupation as defined under the Plan, the two remaining occupations are and, as discussed earlier, there is no evidence that Wilcox would not be able to perform the tasks of those positions or acquire the skills or experience necessary to perform them. Consequently, Aetna's determination that Wilcox was still able to perform a reasonable occupation after September 27, 2016, was not arbitrary and capricious.

> **2.**      **The use of a 100-mile radius when searching for potential positions in the Vocational Report was reasonable**

Wilcox asserts that Aetna's decision was arbitrary and capricious because Coventry's Vocational Report that Aetna relied on used a Deerbrook, Wisconsin home location for Wilcox to search for potential positions when in fact he lived in Neenah, Wisconsin at the time. In addition, the Vocational Report looked at positions in Green Bay, Wisconsin, which is around 2 hours away driving from Deerbrook, despite the fact that Wilcox was limited to never driving because of his conditions. Although the Vocational Report utilized the wrong address, Wilcox's actual address is closer to Green Bay, and the labor market survey would still have looked at comparable positions there even if his correct address had been used. Further, while the specific positions highlighted in the Vocational Report may have required Wilcox to drive, the Vocational Report is intended to determine whether there are a sufficient number of positions within close proximity to Wilcox to assess whether it would be feasible for him to find a position that meets the requirements of the Plan. Even excluding the position of President/Owner, the remaining two positions have 29,250 people employed in Wisconsin with 660 average statewide openings, and identified four positions that were currently available. While transportation may be required to reach some positions, there are other means, such as public transportation or ride services, by which Wilcox could travel to

work. Therefore, Aetna's reliance on Coventry's Vocational Report that used a 100-mile radius when searching for positions around Wilcox's old home address was not arbitrary and capricious.

### 3. The Vocational Report used the correct hourly wage rate when looking for a reasonable occupation

Wilcox contends that the Vocational Report produced by Coventry used a rate equal to 60% of Wilcox's adjusted predisability earnings rather than 80%, which is what the Plan requires for a reasonable occupation. As stated earlier, the Plan defines reasonable occupation as gainful activity that can result in "an income of more than 80% of your adjusted predisability earnings." AR 2259, Dkt. No. 17-7 at 165 (emphasis omitted). Aetna's March 31, 2017 denial letter to Wilcox stated, "The results of the [Vocational Report] indicated that there were three occupations identified that Mr. Wilcox could perform under a sedentary physical demand level, and within his pre-disability earnings of 60%, making a reasonable occupation wage equal to $22.13 per hour for a 40-hour work week." AR 2214, Dkt. No. 17-7 at 120.

Although Aetna cited the wrong percentage in its letter, the hourly rate Coventry used in the Vocational Report and that Aetna used, $22.13, was equal to 80% of Wilcox's pre-disability earnings, and thus not in conflict with the provisions of the Plan. Eighty percent of Wilcox's pre-disability annual salary of $57,200.04 is $46,035.00. AR 220, Dkt. No. 17-1 at 220. This equates to a monthly rate of $3,836.25 and an hourly rate of $22.13—the hourly rate that was used by Coventry in the Vocational Report and that Aetna relied upon. *Id.*; AR 405, Dkt. No. 17-2 at 145 (stating the target wage is $22.13). In addition, the hourly rates for the positions identified by Coventry in the Vocational Report all exceeded this hourly rate. As a result, although Aetna

incorrectly listed 60% in its second denial letter to Wilcox, Aetna did not use an improper hourly rate.

## CONCLUSION

For the foregoing reasons, Aetna's motion for summary judgment (Dkt. No. 18) is **GRANTED**, and Wilcox's motion for summary judgment (Dkt. No. 13) is **DENIED**.  Plaintiff's motion to file documents with restricted access (Dkt. No. 30) is **GRANTED**.  The Clerk is directed to enter judgment accordingly.

**SO ORDERED** this _26th_ day of August, 2019.

s/ William C. Griesbach
William C. Griesbach, Chief Judge
United States District Court